UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CASE NO. PE:26-CR-130 |
| | § | |
| | § | |
| | § | |
| | § | |
| OMAR MACIAS | § | |
| *Defendants.* | § | |

## DEFENDANTS MOTION TO SUPPRESS AND ADVISORY

TO THE HONORABLE DAVID COUNTS:

### I.      Introduction

Defendant Omar Macias files this motion to suppress evidence and statements.

Mr. Macias challenges the constitutionality of the search of his vehicle. Specifically,

he asserts that law enforcement officers exceeded the scope of a traffic stop beyond

what is constitutionally permissible and that the officer's articulated probable cause

for that search was a K-9 search that was unreliable.

### II. Factual Summary Pertaining to the Search[1]

According to government reports, on June 9, 2026 at approximately 5:34 pm,

Mr. Macias was stopped by Fort Stockton Police Department K9 Officer Derek

---

[1] The facts set forth are taken from government reports and body-worn camera footage. The footage will be filed with the Court as Exhibit 1 to the motion. Because the Exhibit is too large to digitally upload to the Clerk's Office, a physical copy will be submitted to the Clerk.

1

Calderon for dark window tint.  Officer Calderon was wearing a body-worn camera which captured the initial seizure and subsequent events.  *See* Exhibit 1.

The recording shows Officer Calderon calling in the stop of Mr. Macias's vehicle to the police dispatcher at approximately 17:35:00.[2]  Officer Calderon made contact with Mr. Macias at 17:35:20 and informed him that the reason for the stop was the window tint.  By 17:35:54, Officer Calderon checked the window tint with a meter and informed Mr. Macias that the tint was too dark and asked Mr. Macias for his license. Mr. Calderon produced his license at 17:36:21. Officer Calderon then asked Mr. Macias to identify everyone in the car and asked for a license for Mr. Macias's wife.  Mr. Macias produced his wife's Permanent Resident ("LPR") card.  Officer Calderon then asked for identification for the children in the car, whereupon Mr. Macias produced LPR cards for his two older children and identified the younger children in the back of the car.  Officer Calderon then ordered the rear window to be rolled down further (17:37:29) and asked for the identification of the two younger children, whereupon Mr. Macias produced US birth certificates for the younger children (17:37:45).

After receiving the birth certificates of the younger children, Officer Calderon asked Mr. Macias to step out of the vehicle (17:37:48). At the rear of the vehicle, Officer Calderon again asked Mr. Macias to identify the names of his wife and children, and Mr. Macias repeated their names while pointing to the names of his

---

[2] References to times from Exhibit 1 are made to the embedded time stamp that is recorded on Officer Calderon's body camera in the top right corner of the recording in the format of hour:minute:second.

children tattooed to his forearms (17:38:34). At 17:38:52, the officer switched from Spanish to English and began questioning Mr. Macias in both Spanish and English. Officer Calderon asked Mr. Macias about where he lived, whether he had been in Mexico, how long he was in Mexico, whether his family was in Mexico and whether they had all been together during their travels. Mr. Macias stated in substance that the family had been in Mexico for two days and had crossed into Mexico on Sunday.

Officer Calderon then walked to the passenger side of the truck where he questioned Mr. Macias's wife, Valeria Molina, regarding the family's travels (17:40:29). Ms. Molina confirmed that they had been in Mexico and had crossed into Mexico on Sunday (17:40:36). Officer Calderon then questioned Ms. Molina about where she lived and asked her to name off her children (17:40:55). He then again inspected the children's birth certificates at the side of the truck, apparently to verify the children's names given by Ms. Molina (17:41:30). He further questioned Ms. Molina regarding the identity of the father of her children. (17:41:56).

By 17:42:26, Officer Calderon ceased to engage with either Mr. Macias or Ms. Molina and began speaking with other officers who had arrived on scene. At this point, at least seven police vehicles can be observed behind Mr. Macias's truck. Initially, Officer Calderon showed other officers the birth certificates and residency cards of the children, stating that "they have all the documents for the kids." Officer Calderon took no other action and engaged the other officers who had arrived in conversation about a variety of police and personal matters that had no relation to the traffic stop. At 17:49:18, Officer Calderon tells Mr. Macias that he's going to have

3

to stop at the Walmart "in a minute" to get some car seats.  He then continued to engage other officers in conversation regarding subjects unrelated to the stop.  At 17:52:00, an unidentified officer wearing a green shirt arrived on scene. Officer Calderon told unidentified officer that Mr. Macias has documents for the children and fresh tattoos and asked the newly arrived officer if he wanted to examine the family's documents.  The unidentified officer announced (17:52:13) "Shoot, I'll look at all of it. I ain't scared of shit." The unidentified officer began to explain to Officer Calderon what features to examine on the Permanent Residency cards to verify their authenticity (17:54:17).  The unidentified officer confirmed at 17:54:50 that the cards "are all legit."

At 17:55:50, the unidentified officer (who never identifies himself to Mr. Macias) began to question Mr. Macias in English, asking him to identify himself and where he was born, whereupon Mr. Macias produced a copy of his birth certificate. The unidentified officer questioned Mr. Macias about what high school he went to in El Paso (17:56:12) and who Mr. Macias's high school rival was.  At 17:58:42, the unidentified officer began to photograph Ms. Molina's LPR card and announced that he's photographing the card because it's easier than "typing all that stuff in."  The officer thereafter asked Mr. Macias where he got his tattoos, where he lives, about his travels to Mexico, and whether he has been arrested before.

DEA Agent Doug McIntyre arrived on the scene and immediately asked Officer Calderon "Did you put the dog on it?" and "Do you got anything else right now?" (18:02:18).  Officer Calderon told Agent McIntyre that they are trying to make sure

the documents are all "matching" with the kids and that they have a car seat violation. The unidentified officer stated in relation to the documents (18:02:45) "they should all be good." Agent McIntyre thereafter told Officer Calderon to check the car "with the dog."

Officer Calderon thereafter walked back to the truck and instructed Ms. Molina and the children to get out of the truck and to stand in the shade. (18:03:50). At 18:05:58 Officer Calderon rolled up the windows on truck. At 18:06:23, Officer Calderon called dispatch and stated "can you start me an additional call sheet for a canine deployment at this time." Officer Calderon removed his K9 from his vehicle (which had been on scene throughout the duration of the stop) at 18:06:51 and proceeded to run the dog on the truck. At 18:09:10, Officer Calderon is heard to announce the dog is "showing interest."

After these events, the truck was transported to the Fort Stockton DPS office and searched, resulting in the discovery of contraband and Mr. Macias's post arrest statements.

## III. Argument

### 1. Standing and Burden

Mr. Macias has standing to challenge the search and seizure because he was the owner and operator of the truck. *See Byrd v. United States*, 584 U.S. 395, 407 (2018) ("The Court sees no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is…privately owned by someone other than

the person in current possession of it…").   Standing for purposes of the Fourth Amendment is subsumed under substantive Fourth Amendment doctrine; it is not a jurisdictional question that must be addressed before considering the merits of the Fourth Amendment claims.  *Id.* In the event the government disputes Mr. Macias's Fourth Amendment standing, then he has a recognized privilege to establish standing without waving Fifth Amendment rights. *See Simmons v. United States*, 390 U.S. 377, 389394 (1968).

As a second threshold matter, the government always bears the burden of showing that a warrantless search and seizure complied with the Fourth Amendment because warrantless searches and seizures are presumptively unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967).

### 2.  The Initial Stop

Officer Calderon's asserted basis for the initial stop was a window tint violation.  A police officer can conduct a pretextual traffic stop without violating the Fourth Amendment, regardless of the officer's subjective intentions.  *See Whren v. United States*, 517 U.S. 806, 813-14 (1996).  However, the government bears the burden of establishing that a traffic violation justifying the initial seizure occurred based on an objective standard without deferring to the officer's subjective understanding of the traffic laws.  *See United State v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006). If the government cannot demonstrate that a traffic violation actually occurred under the objective standard required by the Fifth Circuit, the government cannot meet its burden.  *See e.g., United States v. Raney*, 633 F.3d 385, 392-394 (5th Cir. 2011).

### 3. Officer Calderon Prolonged the Stop Beyond the Time Necessary to Complete the Stop's Mission

The allowable Fourth Amendment duration of police investigation in the context of a traffic stop is determined by the length of time needed to address the traffic violation that warranted the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Florida v. Royer*, 460 U.S. 491, 500 (1983). When the police suspect some other illegal activity in addition to the traffic violation, they may undertake an unrelated investigation during the traffic stop so long as the unrelated investigation does not prolong the time reasonably required to complete the issuing of a warning ticket. *See Caballes* at 407. The diligence of the police officer in conducting the traffic stop is based on an assessment of what the seizing officer "actually did and how he did it." *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015). A traffic stop prolonged beyond the point it would take a diligent officer to expeditiously complete the traffic-based inquiry is unlawful. *Id.* Thus, the continued detention of a defendant after legitimate justification for a traffic stop has ended is an unlawful seizure. *United States v. Dortch*, 199 F.3d 193, 198-200.

The Fifth Circuit has disallowed extensive questioning on topics unrelated to the asserted reasons for a traffic stop that impermissibly extend the duration of the stop. *United States v. Macias*, 658 F.3d. 509, 522 (5th Cir. 2011). But even assuming that officers should be granted a reasonable grace period in which to conduct a traffic stop, Officer Calderon's actions during the entirety of the stop demonstrate that he was unbounded by the asserted reasons for the stop. Officer Calderon made no pretense of issuing a warning or citation related to the asserted reason for the stop, even though his investigation of the alleged window tint violation was completed within one minute of contacting Mr. Macias. Officer Calderon's later reference to a seating violation would have also been immediately apparent to the office in first moments of the encounter. Throughout, Officer Calderon never asked for any form of consent from either Mr. Macias or his wife. Instead, Officer Calderon asked a series of questions related to the identities of Mr. Macias's wife and children, asking for

proof of the identities of Mr. Macias's wife and children, including their residency documents and birth certificates. Those questions and the officer's request to produce identity documents, while intrusive and unjustified, produced nothing suspicious. The documents were produced immediately. The names of Mr. Macias's children (which matched the names on the documents produced to Officer Calderon) were tattooed to Mr. Macias's forearms, as Mr. Macias demonstrated to the officers. The questioning related to the family's travels and the identities of the children, to both Mr. Macias and Ms. Molina, resulted in identical answers. The documents produced by Mr. Macias were authentic. There was nothing suspicious about them, and certainly nothing about them that bore any relation to the asserted reason for the stop, even though Officer Caldoron retained the documents throughout the duration of the stop.

Crucially, Officer Calderon is a canine officer. His canine was present throughout the duration of the stop. He made no attempt to deploy the canine until instructed to do so by Agent McIntyre, over 30 minutes after the initiation of the stop. A police officer may not prolong a traffic stop, even briefly, to conduct a dog stiff unless the officer has developed independent reasonable suspicion of criminal activity. *See Rodriguez vs. United States*, 575 U.S. 348, 354-57 (2015). Officer Calderon did exactly what is prohibited by *Rodriguez*. Officer Calderon stopped engaging with Mr. Macias or Ms. Molina after the first 12 minutes of the initial encounter and after all his questions were met with truthful and consistent answers. He then engaged with other officers on the scene about a variety of other conversational topics that had nothing to do with the traffic stop, only deploying his canine when told to do so by Agent McIntyre, extending the duration of the stop beyond the constitutional breaking point. This requires suppression. *Id.*

4.    **The Government's search of the vehicle was not supported by probable cause**.

While a dog's alert may provide sufficient evidence to support an officer having probable cause to believe he will find contraband,

> "[a] defendant . . . must have an opportunity to challenge . . . evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant. . . . And, even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions."

*Florida v. Harris*, 568 U.S. 237, 247 (5th Cir. 2013). Thus, it is the government's burden to establish the reliability of the alert that the government relies upon in this case, and the failure to do so should result in suppression.

### IV. Motion and Advisory

Counsel for Mr. Macias advises the Court that Mr. Macias will not seek a jury trial in this case and raises the issues presented herein to preserve Mr. Macias's constitutional rights. Mr. Macias prays that the Court will suppress the evidence for the reasons presented herein.

Mr. Macias further acknowledges that this Motion was raised after the Court's scheduling order deadline.  Accordingly, Mr. Macias asks the Court to exercise its inherent authority under Federal Rule of Criminal Procedure 12(c)(3) and Rule 45(b) and for good cause and excusable neglect would show the Court the following.  This

case was indicted on June 24, 2026, and a Motions deadline was set for July 27, 2026.

Initial discovery in this case was produced on July 14, 2026, with additional discovery

produced on July 31, 2026.    Counsel for Mr. Macias was absent from his Pecos

Division office to cover the Midland Division FPD docket and to teach a CLE in El

Paso from July 13 through July 15 and did not have an opportunity to review the

discovery.    Counsel was thereafter out of his Pecos Division office for a long-planned

vacation from July 16th through July 27, 2026.    Counsel for Mr. Macias returned to

cover the Midland Division docket on July 28th and 29th and did not have an

opportunity to review the discovery in his Pecos Division office until July 30th and to

meet with Mr. Macias and review the discovery until July 31st.    Counsel for Mr.

Macias has worked diligently on this Motion since having had an opportunity to

review the discovery and to recognize the issues raised.    Counsel asks for the relief

requested in the interest of justice and not for delay.

Respectfully Submitted,

Maureen Scott Franco
Federal Public Defender


/s/ Chris Carlin
Chris Carlin
Supervisory    Assistant    Federal    Public
Defender
Western District of Texas
108 N. 10th Street
Alpine, Texas 79830
(432) 837-5598
(432) 837-9023 (Fax)
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of August, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Kevin Cayton
United States Attorney's Office
2500 Hwy 118 N., Ste. A200
Alpine, TX 79830

/s/ Chris Carlin
Chris Carlin
Supervisory    Assistant    Federal    Public
Defender

11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CASE NO. PE:26-CR-130 |
| | § | |
| | § | |
| | § | |
| | § | |
| OMAR MACIAS | § | |
| *Defendants.* | § | |

ORDER

Having considered the Defendant's Motion to Suppress, the Court orders:

Any evidence or observations, including any physical evidence or observations made by the agents or derived therefrom resulting from the seizure of the defendant, and including any post-seizure statements made by the defendant, is suppressed from use at trial.

Signed on _____ day of _____, 2026.

_____

DAVID COUNTS
UNITED STATE DISTRICT JUDGE

12